UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

**PILGRIM MISSIONARY BAPTIST CHURCH**    **CASE NO.  1:18-CV-00081**

**VERSUS**                               **JUDGE DRELL**

**CHURCH MUTUAL INSURANCE CO**           **MAGISTRATE JUDGE PEREZ-MONTES**

## R U L I N G

This matter came before the court for bench trial on March 12 - 13, 2020 at the United

States District Court in Alexandria, Louisiana.[1]  At the conclusion of trial, the court took the claims

under advisement and now issues the following ruling.  For the reasons explained below, all claims

by Plaintiff Pilgrim Missionary Baptist Church ("Plaintiff" or "Pilgrim") will be DENIED and

DISMISSED with prejudice.

I.    Background

This suit concerns a coverage dispute between Pilgrim and its property and casualty

insurer, Church Mutual Insurance Company ("Defendant" or "CMIC").  CMIC issued an all risk

policy insuring Pilgrim's several church buildings located at 410 Solomon St. in Alexandria,

Louisiana.[2]  On or about September 6, 2017, Pilgrim, through its finance officer, Sandra O'Neal

---

[1] Minutes of Trial at Docs. 67-68.
[2] Policy No. 0185094-02-914664 (Doc. 35-14). Although neither party disputes the inception date of the policy at
issue and we do not find that the precise inception date bears upon the substantive issues in this case, we do note
here that the record does not contain definitive evidence on this issue.  Plaintiff asserts that the policy was originally
written "at least 15 years ago." (Doc. 57 at p. 1).  Similarly, Lynn Renlund, CMIC Technical Claim Consultant,
testified that CMIC has insured Pilgrim's property since "2002 or 2003." (Trial Transcript at Day 1: Testimony of
Lynn Renlund).  The parties agree that CMIC's all risk policy does not insure the land upon which Pilgrim's
buildings are built. (Trial Transcript at Day 1: Testimony of Lynn Renlund).

("O'Neal") reported a claim for roof damage to its fellowship hall.[3]  Specifically, O'Neal reported that portions of the fellowship hall roof's rafter system appeared to be "rotten."[4]

The claim was assigned to CMIC internal claims adjuster Justin Cruz-Uribe ("Cruz-Uribe") shortly after receipt.  Cruz-Uribe specializes in large loss claims.[5] Based on CMIC's initial assessment of the potential loss, CMIC assigned the claim to both a structural engineer and an independent claims adjuster.[6]  Tod Lewis ("Lewis"), a licensed structural engineer with Rimkus Consulting Group visited Pilgrim's fellowship hall on September 9, 2017.  Lewis recalls that he spent two or three hours at the site and spoke with O'Neal, who was his primary point of contact at Pilgrim, as well as Pilgrim's custodian Mr. Isaac Walls ("Walls"), and several other church members.[7]  Significantly, Lewis found that several support trusses were broken in the area where knots were observed in the wood.[8]  Based on his observations, Lewis prepared and submitted a report to CMIC in which he concluded that: (1) the fellowship hall was not safe for use at that time due to the severity of the hazard presented by the roof truss failure; (2) the roof truss system failed because of an unduly heavy dead load[9] consisting of building materials and a suspended ceiling installed in 2006; and (3) in order for the fellowship hall to be returned to habitable status, the entire roof – including its shingles, felt, decking, trusses, insulation, ceiling framing and all electrical and plumbing would need to be removed, redesigned and rebuilt.  In conjunction with his findings, Lewis issued a hazardous condition letter to Pilgrim dated September 11, 2017,

---

[3] Pilgrim Pretrial Memorandum (R. 57) at p. 2; Trial Transcript at Day 1: Testimony of Sandra O'Neal.
[4] Trial Transcript at Day 1: Testimony of Sandra O'Neal.
[5] Trial Transcript at Day 1: Testimony of Lynn Renlund.
[6] Id.
[7] Trial Transcript at Day 2: Testimony of Tod Lewis.
[8] Id.
[9] "Dead load" is defined as "a constant load in a structure...due to the weight of the members, the supported structure, and permanent attachments or accessories."

wherein he recommended immediate shoring of the roof.[10] After a series of communications between the parties regarding, *inter alia*, finding a contractor to perform the shoring work, Pilgrim received notice on October 16, 2017 that CMIC was denying the church's claim based on the application of a policy coverage exclusion stating, in part:

> B.   Exclusions...
>
> > 2.   We will not pay for loss or damage caused by or resulting from any of the following: ...
> >
> > > d....
> > >
> > > > (2)   Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself...
> >
> > 3.   We will not pay for loss or damage caused by or resulting from any of the following 3. a. through 3. c. but if an excluded cause of loss that is listed in 3. a. through 3. c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
> >
> > > a.   Weather conditions.  But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph 1. above to produce the loss or damage.
> > >
> > > b.   Acts or decisions, including the failure to act or decide, of any person, group, organization, or governmental body.
> > >
> > > c.   Faulty, inadequate, or defective:
> > >
> > > > (1)   Planning, zoning, development, surveying, siting;
> > > >
> > > > (2)   Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
> > > >
> > > > (3)   Materials used in repair, construction, renovation, or remodeling; or

---

[10] Trial Notebook at Joint Exhibit 3: Rimkus Consulting Group Report dated 11/25/2017; Joint Exhibit 16: Letter from Lewis to Cruz-Uribe informing CMIC of hazardous condition of Pilgrim fellowship hall roof and of potential imminent collapse thereof.

> (4)     Maintenance;
>
> of part or all of any property on or off the
> described premises...[11]

CMIC based its denial of coverage on Rimkus' findings as cited above.[12] Stated more succinctly, CMIC denied coverage under Exclusions (2)(d) and (3)(c), referring to latent defect and faulty design or construction.[13] Thereafter, Pilgrim retained an attorney and direct communications between Pilgrim and CMIC ceased.[14]

The parties agree that the shoring work once contemplated among them was never completed and, in 2018 Pilgrim paid contractor James A. Decker Builders, Inc. $76,000 to demolish the fellowship hall.[15] Testimony from Lynn Renlund ("Renlund"), CMIC's Technical Claims Consultant, explained that CMIC attempted on several occasions to contact the independent adjuster to inquire about coordination of shoring work, but didn't have any luck, citing a shortage of adjusters because of Hurricane Harvey. Renlund further testified it was CMIC's intent that Pilgrim pursue shoring on its own, in the absence of any assistance from CMIC, and then submit its invoice to CMIC for reimbursement of the shoring costs. Renlund admitted at trial that this expectation may not have been communicated to Pilgrim. Renlund admitted that the breakdown in communications between CMIC and its independent adjuster in this regard was abnormal.[16]

Pilgrim's suit before this court advances claims for costs incurred in the demolition of its fellowship hall, loss of use of that building, mental anguish, attorney fees and bad faith punitive

---

[11] Trail Notebook at Joint Exhibit 19: Correspondence from CMIC to Pilgrim dated 10/16/2017.
[12] Id.
[13] Id.
[14] Trial Transcript at Day 1: Testimony of Lynn Renlund.
[15] Trial Transcript at Day 1: Testimony of Sandra O'Neal; Trial Notebook at Joint Exhibit 22: Invoice for demolition work by James Decker.
[16] Trial Transcript at Day 1: Testimony of Lynn Renlund.

damages pursuant to La. R.S. 22 §§ 1893 and 1973.[17] CMIC timely removed this suit and denies all allegations, including those of bad faith.[18]

II.   Coverage

As in any case in which we are called upon to interpret the terms of an insurance policy, we begin with an acknowledgement of the fundamental precepts of law that will guide our analysis. A federal district court applies the choice of law rules of the forum state.[19]  As a federal district court sitting in Louisiana, we apply Louisiana's choice of law rules, which provide that that law of the state where the insurance contract was issued and executed generally governs interpretation of that contract.[20]

Louisiana law provides that insurance policies are contracts between the parties and must be construed using general principles of contract interpretation set forth in the Civil Code.[21] Looking to the words of the insurance contract itself, the court must seek the common intent of the parties.[22]  The words of an insurance contract are to be given their "plain, ordinary and generally prevailing meaning, unless words have acquired a technical meaning, in which case the words must be ascribed their technical meaning."[23]  When the words of the insurance contract are clear and lead to no absurd result, no further interpretation may be made by the court in search of the parties' intent.  The court must simply enforce the policy as written.[24]  Any ambiguity that may remain after application of the rules of contractual interpretation must be construed against the

---

[17] State court petition at Doc. 1-1.
[18] Answer at Doc. 10.
[19] Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496 (1941).
[20] Solstice Oil & Gas I, LLC v. Seneca Ins. Co., named as Seneca Ins. Co., Inc., 665 Fed. Appx. 221 (5th Cir. 2016); Pioneer Expl., LLC v. Steadfast Ins. Co., 767 F.3d 503, 512 (5th Cir. 2014).
[21] Sims v. Mulhearn Funeral Home, Inc., 956 So.2d 583, 588-90 (La. 2007) (internal citations omitted).
[22] La. Civ. C. Arts. 2045, 2046.
[23] La. Civ. C. Art. 2047; Sims, 956 So. 2d at 589 (internal citations omitted).
[24] La. Civ. C. Art. 2046.

insurer and in favor of coverage.[25]  Whether or not an insurance contract is ambiguous is a question of law.[26]

To avoid application of the latent defects exclusions, Pilgrim claims that the roof truss system of its former fellowship hall sustained damage during a windstorm in August of 2016.[27] Pilgrim's custodian, Isaac Walls ("Walls") testified that he has lived in a home located behind the church since 1998 and recalls a "severe" wind event in August of 2016, during which he lost a portion of his own roof and felt his home rocking "considerably."[28]  Walls also recalled a tree falling in the church parking lot across from the fellowship hall, requiring that he and several church members cut and clear the debris after the storm abated.[29]

In contrast, O'Neal testified that church members, particularly church Deacons, were aware of and concerned about the fact that the fellowship hall appeared to be "leaning" for "some time" before August of 2016.[30]  When asked whether or not the troubling condition of the fellowship hall was made worse after the August 2016 storm, she denied that the storm exacerbated the condition.[31]  O'Neal explained that the, now, longstanding concern for the condition of the building was the reason Pilgrim called on Lloyd Moreau ("Moreau"), a general contractor, to come and look at the building in 2017.[32]  O'Neal's testimony was vague, but seemed to suggest that, while he was called for general concerns about the building, he discovered the roof truss issue, during his own inspection.  At trial, O'Neal testified as follows.

> Q: So that was a different problem than what you had actually called
> him about, what he discovered, the roof?

---

[25] La. Civ. C. Art. 2056.
[26] Sims, 956 So.2d at 590 (internal citations omitted).
[27] Complaint (Doc. 1-2) at ¶ 5.
[28] Trial Transcript at Day 1: Testimony of Isaac Walls.
[29] Id.
[30] Trial Transcript at Day 1: Testimony of Sandra O'Neal.
[31] Id.
[32] Id.

> A: Well, that was actually – the building – I guess all of it was kind of - all of it played into the problem with the roof. The building leaning, which was actually all of the structural damage, I guess, all of that played into that because we didn't know what it was.[33]

Moreau also testified at trial.  Moreau recalled visiting the fellowship hall several years earlier, in 2011, to provide an estimate for installation of a metal roof.  At trial, Moreau testified that at that time, the roof trusses and decking were in satisfactory condition to receive a new roof.  Upon his next visit in 2017, however, he found the trusses and decking too damaged and unable to sustain a new roof.  He described the damage as if the roof had been "crushed straight down."[34]  Moreau issued a letter dated August 17, 2017, in which he attributed the roof damage, which included an 12 or 13-inch sag, to a weather event and encouraged Pilgrim to contact its insurer.[35]  When asked at trial whether he was ever told by anyone from Pilgrim about a weather event in August of 2016 being a suspected cause of the damage at issue, Moreau denied receiving this information.[36]

We turn, next, to the two competing expert witnesses featured in this case.  In support of its theory of causation, Pilgrim offered the testimony and report of Mark Norman ("Norman"), a licensed professional engineer with expert qualifications in the fields of civil engineering, structural wind force and damage assessment.  Norman conducted his inspection of the building on September 5, 2018.[37]

Norman's report begins with the premise that a weather event sometime in the month of August of 2016 was to blame for the damage to Pilgrim's fellowship hall. Using NOAA data for

---

[33] Id.
[34] Trial Transcript at Day 2: Testimony of Lloyd Moreau.
[35] Trial Notebook at Joint Exhibit 10: Letter from Lloyd Moreau dated August 17, 2017.
[36] Trial Transcript at Day 2: Testimony of Lloyd Moreau.
[37] Trial Transcript at Day 1: Testimony of Mark Norman.

that month, he narrowed his opinion to the belief that windstorms occurring between August 12th and August 15th of 2016 were the sole cause of the roof truss failure. Specifically, Norman found that barometric pressure increases, to which he attributed an additional 9 pounds per square foot of dead load, and significant wind gusts during August 2016 would have, when combined with the existing dead weight of the truss system at 20 pounds per square foot, resulted in the failure of the truss system.[38]  Norman also concluded that the configuration of the fellowship hall and its adjoining building, believed to be a kitchen or dining hall, created a stress point that prevented wind from circulating around the fellowship hall without creating stress overload points in the roof, which he testified he believes resulted in the rafter failures at issue.[39]

In contrast, CMIC offered the report and testimony of Lewis, in support of Rimkus' report and its theory that the fellowship hall's roof truss system failed due to faulty design and construction using defective materials. Lewis elaborated on his findings, explaining that Pilgrim's truss system was constructed of a series of two-by-six boards arranged in an "unconventional" pattern that was not supportive enough of the type of load created by the dead weight attributable to the roof, multiple ceilings, heating and cooling system and electrical work.[40] Lewis continued, pointing out that he would expect to find "chord members," also referred to as "rafters" of a larger size, noting that Pilgrim's truss system was comprised of two-by-four and two-by-six members nailed together, without supporting gang plates or gussets, though in some places bolts were added.[41] Lewis characterized the boards used in the truss system as "grossly undersized."[42] Lewis further recalled that in many chord members he observed the presence of knots at or near the point

---

[38] Trial Transcript at Day 1: Testimony of Mark Norman; Trial Notebook at Joint Exhibit 7: Report of Mark Norman.
[39] Id.
[40] Trial Transcript at Day 2: Testimony of Tod Lewis;
[41] Id.; Trial Notebook at Joint Exhibit 3: Rimkus Consulting Group Report dated 11/25/17 at p. 6.
[42] Id.

of failure.  Lewis explained that knots in a wooden board present a "natural weakness and failings typically occur at that location."[43]  Lewis pointed out several examples, using photographs of broken chord members, illustrating this point and featuring  a fracture in the wood occurring just above or below an existing knot.[44]  When asked whether or not he agreed with Norman's opinions as to the impact of August 2016 winds on the truss system, Lewis did not agree, pointing out that church members denied that winds from Hurricane Katrina, a Category 5 storm in August 2005, did damage to the fellowship hall beyond knocking loose several roof shingles.  Accordingly, Lewis reasoned that far lesser winds in August of 2016 would not be a reasonable cause of the substantial damages he observed in the truss system. [45]  When asked if O'Neal or any other church member present at his September 9, 2017 site visit and damage assessment mentioned a 2016 weather event as a suspected cause of damage to the fellowship hall, Lewis denied that any church member mentioned weather as a potential cause.[46]

Under applicable Louisiana law, Pilgrim bears the burden as the insured to prove coverage under the Policy.[47]  CMIC, as the insurer, bears the burden of showing that one or more exclusions of the Policy apply to the facts of the case.[48] Having carefully reviewed the trial testimony and the reports authored by both Norman and Lewis, as well as the Policy at issue, the court finds in favor of CMIC on the issue of coverage.  Pilgrim fails to show that the damage to its fellowship hall roof truss system was caused by a covered loss under the terms of the Policy.

We base our coverage determination on our assessment of the recited causation evidence offered at trial.  Although each party offered expert testimony regarding causation, the court found

---

[43] Id.
[44] Id., referring to Trial Notebook at Joint Exhibit 3: Photograph 4 contained in Rimkus Consulting Group Report dated 11/25/17.
[45] Id.
[46] Id.
[47] Doerr v. Mobil Oil Corp., 774 So.2d 119, 124 (La. 2000).
[48] Id.

Case 1:18-cv-00081-DDD-JPM   Document 72   Filed 11/24/20   Page 10 of 16 PageID #: 1554

CMIC's expert, Lewis, and the report authored by Rimkus to be the more credible evidence of causation in this case. Specifically, we observe the following: (1) O'Neal's report of the claim to CMIC in September of 2017 did not make reference to an August 2016 weather event or to concerns regarding the building predating the August 2016 weather event; (2) neither O'Neal, nor Walls mentioned the August 2016 weather event to Lewis during his hours-long site visit in September of 2017; (3) there is no evidence before the court to suggest that Pilgrim reported any damage or claim based on the August 2016 weather event at issue to Pilgrim prior to receipt of findings from Moreau on August 15, 2017;[49](4) Norman's report begins with the supposition that the August 2016 weather event caused the damage, but does not explain how it arrives at this premise; and (5) support for the advent of the August 2016 weather event as the cause of the damage at issue appears to based only on vague recollection and unverifiable anecdotes. Taken together, these facts undermine the credibility of Norman's report and testimony in this case. Our view is that this report has the appearance of being prepared solely at the direction of Pilgrim with little independent verification and little foundation. It is the province of this court to make credibility determinations, particularly as to witnesses in bench trials.[50] In this matter, we find that Norman failed to establish a foundation for his report's starting premise. Although our lack of confidence in Norman's analysis does not rise to the level that would require us to disqualify him as an expert under the standard set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc.,[51] in this

---

[49] The court notes that Moreau's August 17, 2017 correspondence includes an opinion as to causation, stating that Moreau, "determined that you should call your insurance company as this damage relates from upper pressure which is weather related." The court has no basis upon which to admit Moreau as an expert in meteorology, nor in structural engineering. Moreau was not tendered as an expert witness at trial and was not qualified by the court in that capacity. We do not, accordingly, consider this opinion portion of the letter as credible evidence of causation.
[50] Luwisch v. American Marine Corp., 956 F.3d 320, 326 (5th Cir. 2020) (internal citations omitted).
[51] 509 U.S. 579 (1993) (a trial judge is tasked with ensuring expert witness testimony is sound under the criteria set forth in Fed. Rule Evid. 702, which are fashioned to permit only such scientific opinion evidence as is both relevant and reliable and will give aid to the fact finder in its task of evaluating the evidence and issues before it).

case we must choose between competing causation theories.  We find that Rimkus' analysis is the more fact-based approach and more reliable.

Rimkus' report, published to both Pilgrim and CMIC in September of 2017, details several material and design flaws contributing to the damages Lewis observed during his site visit.  As mentioned above, Lewis noted the following: (1) an unconventional truss design resulting in an uneven weight distribution; (2) a dead load of 20.5 lbs. per sq. ft.; (3) smaller than average wood members used in construction; and (4) the presence of and impact of knots in wood members.[52] Like Norman, Lewis also considered the impact of weather.  Drawing upon information from NOAA, Lewis gathered data indicating that during Hurricanes Rita, Gustav, and Isaac, maximum wind speeds were reported as 62, 61 and 51 miles per hour, respectively.[53]  Lewis listed O'Neal as the only Pilgrim representative to provide information during his inspection.  Lewis also summarized the information O'Neal provided during their meeting.  Of note, O'Neal did not document for Lewis that an August 2016 storm was suspected to have caused damage. Contradictorily, O'Neal denied that Hurricane Katrina, occurring in 2005, caused damage to the church but recalls that the fellowship hall did sustain roof damage in 2005's Hurricane Rita. O'Neal further explained that the fellowship hall received an entirely new roof following Hurricane Gustave in 2008 as a result of roof damage sustained in that storm.  Finally, O'Neal recalled that the fellowship hall's drop ceiling, which added additional weight to the dead load of borne by the roof truss system, was installed on top of the existing ceiling in 2006.[54] Based on his own inspection of the trusses and the information gained from his research, Lewis concluded that the results of the substandard design and materials found within the Pilgrim fellowship hall truss

---

[52] Trial Notebook at Joint Exhibit 3, pp. 3-7.
[53] Id. at p. 6.
[54] Id. at p. 3

11

system were: (1) an overloading of the trusses, concentrated at the lower truss joints; (2) frequent fractures of wood members at or near knots; and (3) long-term creep resulting in truss failure at joints.[55]   Lewis did not attribute the failure of the truss system to any weather event. Lewis cautioned that the condition of the trusses was a serious hazard that could lead to collapse of the roof and ceiling at any time and, for that reason, he was unable to inspect certain portions of these areas.  Lewis recommended shoring of the building to enable further testing.[56]

At trial, Lewis affirmed his testimony that the design and materials, along with the passage of time, caused the roof truss failure at issue.  Lewis further denied that an August 2016 weather event might have caused such damage.  When asked if he found any weather events in that time frame he felt may have been capable of causing the damage found at the fellowship hall, he responded, "no."  Thus, Lewis disagreed with the causation premise of Norman's report.

The facts of this case support CMIC's expert report, prepared by Rimkus, and the expert witness testimony offered by Lewis.  In addition to the factors listed above, another important discrepancy bears noting here.  In her testimony, O'Neal added that the building's condition included noticeable "leaning" that was concerning to church Deacons for some time prior to the August 2016 storm and was not worsened by the storm.  Although not a touchstone to this decision the building's preexisting leaning adds credence to CMIC's theory of faulty design, substandard materials and/or construction as the cause of the fellowship hall roof truss failure.

To summarize, Rimkus' report and Lewis' testimony highlight several features of the roof truss system that the court agrees, by adoption of the expert witness opinion evidence, constitute faulty building design.  First, we find that the construction of this system of webbed trusses without support plates and, in many places, without bolts, held together with simple facing nails, was

---

[55] Id. at p. 2
[56] Trial Transcript at Day 2: Testimony of Tod Lewis.

substandard for a building of this size.   While it is undisputed that it stood from 1950 until sometime after 2011 without failure, the various alterations and the passage of time cause building failure.   Moreover, even though it was built in a "different time" under "different standards," we decline to accept that this must automatically meant that this building should not last beyond 60 years, since many buildings from this era obviously do.

Next, we find that the fractures of the wooden truss members do track exactly the knots present in the wood, affirming the theory of material weakness espoused by Lewis.   Thus, we likewise find that the selection of unsuitable building materials for this project contributed to the eventual failure of the truss system.

Likewise, we find that the dead load of the building was substantial and, because of the unconventional truss configuration, improperly distributed among the trusses along major stress points.   We note here that Norman's report also concluded that the fellowship hall was the subject of faulty construction in that the way it was attached to its adjacent building (a kitchen or dining hall) which created stress points subject to wind.   As explained above, we do not rely upon Norman's report, but even Norman's theory of failure relied, as a baseline, on the involvement of improper design in the failure.   We do also find Lewis' theory of long-term creep based on the material defects and design flaws to be highly credible.   Record evidence of a developing roof sag, visible at a measurement of approximately one inch existed as early as 2011 is support for the theory of creep as a contributing cause of the failure of the roof truss system as well.

Based on the foregoing, this court finds that the losses at issue in this case are excluded from coverage under the policy issued by CMIC in this case by operation of Exclusion 2.d.2 providing for the exclusion of losses resulting from deterioration; Exclusion 3.c.2 excluding

coverage for losses attributable to faulty design and construction; and Exclusion 3.c.3 excluding coverage for losses attributable to the quality of materials used in construction.[57]

III.   Bad Faith

Louisiana law requires insurers to pay the amount of any claim due an insured within thirty (30) days of receipt of satisfactory proofs of loss. La. R.S. § 22:1892A(1). Subsection B(1) further provides that when an insurer's failure to pay such claim is found to be "arbitrary, capricious, or without probable cause[.]" La. R.S. § 22:1973 imposes a similar duty of good faith settlement of claims. The operative difference among these statutes lies in the amount of time in which the insurer must comply. § 1892 provides thirty days in which the insurer must comply or be subjected to a penalty in the amount of the greater of fifty percent of the insured's damages or $1000. §1973 provides that the insurer must comply within sixty (60) days or face penalties in an amount not to exceed the greater of twice the insured's damages or $5000. These statutes, penal in nature, must be strictly construed.[58]

As indicated by the statutes themselves, bad faith is not inferred when an insurer possesses a justifiable belief that the claim filed by its insured is not covered under the policy at issue.[59] Given the court's substantive finding that the policy issued by CMIC in favor of Pilgrim did not provide coverage for the claim at issue, we logically find that CMIC possessed a good faith basis for its denial of Pilgrim's claim for repair and replacement of the fellowship hall's roof truss system and damages resulting from the failure of that building feature. Within this conclusion, we specifically include Pilgrim's claim for the cost of demolition of the fellowship hall.

---

[57] Trial Notebook at Joint Exhibit 1: Policy No. 0185094-02-914664 issued by CMIC in favor of Pilgrim at
[58] Louisiana Bag Co., Inc. v. Audubon Indent. Co., 999 So.2d 1104, 1112-13 (La. 2008); Reed v. State Farm Mut. Auto. Ins. Co., 857 So.2d 1012, 1021 (La. 2003).
[59] Louisiana Bag, 999 So.2d at 1115 citing Reed, 857 So.2d at 1021.

Regarding Pilgrim's claim for bad faith as it relates to the issue of shoring of the fellowship hall, we note first that we agree with CMIC's contention that the cost of shoring was not an expense for which the policy provided coverage. As addressed above, mitigation of the damage stemming from the roof truss failure would not be covered by the Policy because such failure occurred as the result of faulty design and/or materials, which are expressly excluded under the Policy. However, Renlund's testimony affirmed that CMIC agreed to incur the cost of shoring as a "file expense" in this case.[60] Assuming that this court were to find that CMIC's poor communication efforts surrounding its intention to reimburse Pilgrim for the shoring work amounted to bad faith, the court could not impose penalties for such behavior under La. R.S. §§ 22: 1793 or 1892A(1), as these statutes require, as discussed above, the submission of satisfactory proofs of covered loss to the insurer. Again, the cost of shoring is undisputedly not a covered loss in this case. Accordingly, nonpayment of such cost cannot form the basis of a bad faith claim under the aforementioned statutes.

IV.   Conclusion

The court, having carefully considered Pilgrim's claims for coverage under the Policy and for punitive damages under Louisiana's bad faith insurance law provisions, finds Pilgrim failed to demonstrate that the Policy at issue provided coverage for the claimed damage to its fellowship hall caused by failure of its roof truss system and subsequent building demolition. Similarly, this court finds that CMIC did not violate Louisiana's bad faith insurance law provisions found at La. R.S. §22:1793 and/or 1892A(1) when it failed to pay Pilgrim for the cost of shoring the fellowship hall, as such cost was not a covered loss under the Policy. Given these findings, Pilgrim's claims will be DENIED and DISMISSED with prejudice.

---

[60] Trial Transcript at Day 1: Testimony of Lynn Renlund.

The court will issue a judgment in conformity with these findings.

Alexandria, Louisiana
November 24, 2020

DEE D. DRELL, JUDGE
UNITED STATES DISTRICT COURT